Harold A. NEWTON and Joel E. Scroggins, co-partners doing business under the firm name and style of Pine Meadow Farm, Plaintiffs,

v.

ROCKWOOD & CO., Defendant.

Civ. A. No. 64-326.

United States District Court
D. Massachusetts.

Dec. 9, 1966.

William J. Murphy, East Longmeadow, Mass., for plaintiff.

Stephen A. Hopkins, Sherburne, Powers & Needham, Boston, Mass., for defendant.

OPINION

CAFFREY, District Judge.

This civil action, sounding primarily in tort for negligence and less clearly in a claim for breach of implied warranty of fitness for the intended purpose, was tried to the Court after its removal from Suffolk Superior Court on the basis of diversity jurisdiction. The plaintiffs, co-partners, are residents of Massachusetts, d/b/a Pine Meadow Farm. The defendant is a Delaware corporation with its principal place of business in Ft. Atkinson, Wisconsin.

Plaintiffs' basic theory of liability in the instant action is that the defendant negligently constructed, assembled, arranged, positioned, and adjusted, an automatic cow milking system on plaintiffs' farm, in an unsafe, defective, and dangerous manner, thus producing a dangerous condition as a result of which many cows in plaintiffs' herd became violently ill and injured, with the consequence that the quantity of milk supplied by the herd was substantially reduced, and that because of illness to the cows the milk produced by some of them was rendered unfit for market use and unsaleable, plaintiffs were forced to incur expenses for veterinarian care and medicine and for additional labor in caring for and segregating the injured cows, and, finally, they were forced to sell as beef cattle many of the injured cows at a substantially lower price than the price of a healthy milk-producing cow.

James Manufacturing Company manufactures a complete line of barn and milking equipment. It sells its products through authorized dealers throughout the United States. In August 1961, Roy Ebner, a field representative of defendant, together with a salesman from Goldstein & Gurvitz, a dealer in farm equipment with a place of business in Ware, Massachusetts, visited Pine Meadow

Farm looking toward the sale to plaintiffs of a Jamesway milking parlor. Goldstein & Gurvitz had previously sold other equipment to this farm. Plaintiff Harold Newton discussed with them at some length the operations of the Jamesway milking parlor and he examined certain sales literature containing photographs and sketches of the equipment on this occasion. He discussed with Ebner the cost figures and various aspects of the installation of the system. Newton testified that Ebner indicated that "they" would install the system properly. Although Newton testified that Ebner orally informed him that "guarantees" contained in this sales literature (Plaintiff Exhibits 1 and 2), came with the system, I rule that these exhibits contain nothing which properly can be construed as a guarantee.

Plaintiff Newton and his partner Scroggins had been examining various available automatic milking systems for some time. They had a herd of about 250 cows which when they purchased the farm were being milked by the use of Chore Boy bucket milkers at the cows' posts in the barn. The milk was then pumped from the bucket milkers into 20-quart cans. The cans were wheeled on a cart into the milk room, dumped into a strainer, and then run over an aerator into a 1000-gallon bulk storage tank. This work was done by four herdsmen, each of whom milked from 50 to 55 cows daily. According to Newton, plaintiffs figured "this (the Jamesway system) was the best deal we could get." They executed a written contract of purchase and sale, not with defendant, but with Goldstein & Gurvitz. This "Retail Installment Contract" identified Goldstein & Gurvitz as the seller and plaintiffs as the purchasers. It covered 20 Herringbone Milking Parlor Stalls, 6 Floor Drains, 1 Jamesway Milker—complete, and 4 Vacuum Door Controls, all new. This contract specifically provided, in fair size type, "No warranties or representations have been made by seller unless endorsed hereon in writing." There was no endorsement of warranty on the contract. In very large type appear the words, "Notice to the Buyer," followed by a legible admonition, "Do not sign this contract before you read it or if it contains any blank space." The reverse side of the contract, under a heading "Detailed Conditions of Purchase and Sale," contains the statement "This agreement constitutes the entire contract between the parties." Thereafter, the contract was assigned by Goldstein & Gurvitz to defendant which, in turn, discounted it to the James Talcott Company of Chicago.

In the course of discussions with Ebner, plaintiffs informed him that an aerator which had been used at the farm to cool milk prior to its entering the storage tank was condemned in August 1960 by the Milk Inspector. Ebner suggested to Newton, who although not pressed by the Inspector was interested in replacing the condemned aerator, that he discuss the matter with a representative of a New York firm which distributed a triple tube cooler. Ebner talked to one Tomkins, a sales representative for the Sanitary Processing Equipment Corporation of East Syracuse, New York, the manufacturer of the triple tube cooler, and placed an order with Tomkins for a 30-foot cooler which was delivered to plaintiffs' farm in October 1961 and connected into the automatic milking system. Newton testified that this cooler was supposed to have a $\frac{3}{8}''$ wide ring inside the tube of the two pipes for the milk to pass through. The basis of this belief was a conversation that he had had with Tomkins.

The cooler when delivered was encased in a stainless steel welded casing and the ring core in question could not have been measured for size without first breaking the casing and dismantling the entire cooler. There were no markings of any kind on the outside of the casing which indicated the size of the ring core. Newton testified that in installing this cooler into the automatic milking system he relied on Tomkins' say-so that it had a $\frac{3}{8}''$ ring. Various difficulties arose from the operation of the automatic milking system and Ebner visited the farm two

or three times a week in efforts to "trouble-shoot" the system and improve its operation. It appeared that the system did not function properly because the lines carrying the milk to the storage tank filled up with milk and it also appeared that adequate vacuum was not being produced to properly operate the system. Ebner relocated the receiver jar from the milking side of the system to the storage side and this, to some extent, caused an improvement, but difficulties still remained. Teat cups were falling off the cows from time to time and many of the cows were not being completely milked, with the result that it was necessary to hand-strip them. Because of plaintiffs' continued dissatisfaction with the system, one Grady Comstock, a representative of defendant, flew on from Wisconsin, checked the system, made minor adjustments, and instructed the farmhands as to the proper use of the system.

In January 1962, Ebner was promoted to other duties and replaced by one Gordon Baker as defendant's field representative. Baker visited the farm in February 1962 and on the basis of Newton's complaints made arrangements to ship a larger vacuum pump to the farm on an even exchange basis. When installed this improved the system. The system was continued in use without serious difficulties until after the cows were turned out to pasture in May 1962, and in late may and early June a very sharp rise in the disease known as mastitis occurred in the herd. Gordon Baker had been visiting the farm about once a month checking the equipment and "could not find too much really wrong with the system." He had been told by plaintiff Newton that the triple tube cooler had a ⅜" ring. In the spring of 1962 plaintiffs hired an independent expert, Harry Hamilton, to inspect the system, and after looking it over he advised them that he found nothing wrong with it and that "it was as good as could be expected." He also was told by Newton that the cooler had a ⅜" ring.

In June 1962, Baker again visited the farm, this time in the company of Robert Ridder, a now deceased former employee of defendant. Because Newton was still dissatisfied with the system, they requested his permission to pull the cooler apart, whereupon it was discovered that the ring core of the cooler was not ⅜" in diameter as Newton had believed, and had informed the representatives of defendant and his own independent expert, but, on the contrary, was only 3⁄16" in diameter. After this discovery was made, the center pipe of the cooler was pulled out, with Newton's permission, and the cooler was put back into use with milk flowing into open pipe rather than through a ring core, whereupon the system then operated in a completely satisfactory manner and the incidence of new cases of mastitis in the herd terminated almost immediately.

On June 27, 1962, plaintiff Newton wrote a letter to Ebner who was vacationing in Florida, in which he said in pertinent part:

"We have at last found the cause of all of our trouble with the milking parlor. * * * They found the pipe was 3⁄16" instead of ⅜th. I understood that this triple tube cooler had a ⅜" space for ring of milk around the outside of the center pipe. Their measurement of 3⁄16" is not near enough room for the milk and proper vacuum. We took the center pipe out and it has eliminated our milker problem. If there had been a ⅜" ring like I thought we would have had no trouble."

Whether the instant case be viewed as one relying primarily on allegations of negligent manufacture, or of negligent installation, or breach of implied warranty of fitness for the intended purpose, plaintiffs cannot prevail because there is a failure of proof of either negligent manufacture by defendant or negligent installation by defendant. There is no credible evidence that the equipment manufactured by defendant is not reasonably fit for its intended purpose. What has been shown here is that plaintiffs

purchased from a party over whom defendant has no control and for whose neglience and, *arguendo*, breach of warranty, defendant has no responsibility, a triple tube cooler, the innermost conveying area of which was only half the size that plaintiffs understood it to be on the basis of representations made by Tomkins, the agent for the manufacturer of the triple tube cooler. There has been no proof of any agency relation between Tomkins and defendant or anyone for whose conduct defendant is legally responsible. The warranty count must also fail because there has been no showing that plaintiffs were in privity of contract with defendant. The evidence, including plaintiff Newton's own admission in his letter of June 27, 1962 to Ebner, shows that the only thing definitely wrong with the milking system as installed was the fact that the capacity of the triple tube cooler was only half of what plaintiffs and certain representatives of defendant, who got their information from plaintiffs, believed it to be.

I find that the triple tube cooler was a separate product, not part of defendant's Jamesway milking parlor, and that the problems with the herd, if caused by defective equipment at all, were not caused by defective equipment for which defendant bears any responsibility. Cf. Hamson v. Standard Grocery Co., 328 Mass. 263, 103 N.E.2d 233 (1952); Pabon v. Hackensack Auto Sales, Inc., 63 N.J.Super. 476, 164 A.2d 773, 783 (N.J. 1960).

Even if negligence or breach of warranty had been established herein, and assuming without deciding that plaintiffs demonstrated a causal relationship between either negligence or breach of warranty and injury to the herd, a finding could not be made in their favor because of their failure to prove damages beyond the realm of speculation.

Plaintiffs' evidence tended to show that some cows incurred mastitis. The record is not clear as to how many suffered from mastitis because of claimed defects in the automatic milking system, and how many got mastitis from other causes. The evidence as to the identity and value of whatever cows were sold because of mastitis caused by milk machine defects is spotty and inconclusive. There is only evidence of the value of one particular cow allegedly sold because of mastitis, and the figures given with regard to loss of milk production are inadequate to sustain a finding for damages because while they might be used to produce an ascertainable decrease in gross income, there is no evidence on the record to establish what charges should be applied against this gross income in order to show the decrease in net income.

Suffice it to say that on the evidence before the Court on the issue of damages, plaintiff has failed to comply with the direction of the Court of Appeals for this Circuit contained in its opinion in Robie v. Ofgant, 306 F.2d 656, 660 (1 Cir. 1962): "[Plaintiff's] damages must be proven, that is, they must not be speculative, and he must not be made more than whole."

Complaint dismissed. Judgment for defendant.